**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| PATRICK O'DONNELL, WAYNE SAFFOLD, MARK PAPENFUSS, JOHN PITTS, and MARIA JIMENEZ, individually and as representatives of a class of participants and beneficiaries on behalf of the CHARTER COMMUNICATIONS, INC. 401(K) SAVINGS PLAN, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., CAROLYN WOOD, PAUL WEBER, and JOHN DOES 1–10, <br><br> *Defendants*. | Civil Action No. 4:25-cv-00157-ZMB [rel. 4:25-cv-00178-ZMB] <br><br> **CLASS ACTION COMPLAINT** <br> JURY TRIAL DEMANDED |

**CONSOLIDATED COMPLAINT**

1. Plaintiffs Patrick O'Donnell, Wayne Saffold, Mark Papenfuss, John Pitts, and Maria Jimenez ("Plaintiffs"), individually and as representatives of a class of participants and beneficiaries of the Charter Communications, Inc. 401(k) Savings Plan (the "Plan"), bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3) against Defendants Charter Communications, Inc. ("Charter"), Carolyn Wood, Paul Weber, and John Does 1–10 (collectively referred to herein as "Charter" or "Defendants") for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").

2. As Plan fiduciaries, Defendants were obligated to act for the exclusive benefit of Plan participants and beneficiaries and ensure they act loyally and prudently when administering the Plan. These fiduciary duties are the "highest known to the law." *Braden v. Wal-Mart Stores,*

*Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Rather than using the Plan's forfeiture assets to pay *all* Plan administrative expenses, as expressly required by the terms of the Plan, Defendants used Plan assets to benefit themselves by reducing Charter's employer matching contributions using the Plan's forfeiture assets. Their conduct was contrary to the Plan's plain terms and a direct violation under 29 U.S.C. § 1104(a)(1)(D). Under the same facts and circumstances, Defendants separately breached their fiduciary duties of loyalty and prudence under § 1104(a)(1)(A)–(B), and committed prohibited transactions under § 1106.

3.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action under 29 U.S.C §§ 1132(a)(2) and (a)(3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan Defendants' profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek to enjoin any act or practice that violates ERISA or the terms of the Plan and "other appropriate equitable relief" to redress "any act or practice" that violates ERISA or the terms of the Plan. 29 U.S.C. § 1132(a)(3); 29 U.S.C. § 1109(a). As explained in detail below, by unlawfully charging Plan administrative expenses to Plan participants' and Plaintiffs' retirement accounts in violation of ERISA, Defendants engaged in and continue to engage in conduct that must be redressed and enjoined.

### JURISDICTION AND VENUE

4.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and (a)(3).

5.      **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where at least one of the alleged breaches took place and where at least one defendant resides, may be found, or regularly transacts business in-person.

6.      **Standing.** An action under § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). A plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Plan participants have individual accounts which are harmed when the Plan is harmed. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plan.

7.      To the extent Plaintiffs must also show individual injuries, Plaintiffs have suffered such injuries from being subjected to the fiduciary breaches alleged herein, including by having improper and/or a greater amount of fees deducted from their Plan accounts. These fees would not have been incurred but for Defendants' misconduct and self-dealing, thereby reducing the value of Plaintiffs' retirement assets. Because Plaintiffs had their retirement benefits diminished by fees that Defendants were obligated to pay, Plaintiffs' retirement assets are less valuable.

**PARTIES**

**I.      Plaintiffs**

8.      Patrick O'Donnell resides in Madison, Wisconsin, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. O'Donnell began his employment with Charter in

3

approximately 2000. Mr. O'Donnell worked in Technical Operations as a Maintenance Technician, and began investing in the Plan immediately upon his employment. In addition to his participation in the Plan, Mr. O'Donnell was also a participant in the Charter Communications, Inc. Retirement Accumulation Plan. Mr. O'Donnell's employment with Charter ended in 2022, but he remains an active participant in the Plan. As described in more detail below, Mr. O'Donnell's account in the Plan was improperly charged with administrative fees.

9. Wayne Saffold resides in Bayonne, New Jersey, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Saffold began his employment with Charter in 2022. Mr. Saffold worked in sales as a Business Account Executive, and began investing in the Plan in 2022. Mr. Saffold's employment with Charter ended in September 2024, but he remains an active participant in the Plan. As described in more detail below, Mr. Saffold's account in the Plan was improperly charged with administrative fees.

10. Mark Papenfuss resides in Valley Center, California, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Papenfuss began his employment with Charter in 2011. Mr. Papenfuss worked as a team lead in the Charter SCS Department, and began investing in the Plan in 2011. Mr. Papenfuss's employment with Charter ended in November of 2021, but he remains an active participant in the Plan. As described in more detail below, Mr. Papenfuss's account in the Plan was improperly charged with administrative fees.

11. John Pitts resides in Cedar Park, Texas, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Pitts began his employment with Charter in 2020. Mr. Pitts worked as a Strategic Account Manager, and began investing in the Plan in 2020. Mr. Pitts' employment with Charter ended in early 2025, but he remains an active participant in the Plan. As

described in more detail below, Mr. Pitts' account in the Plan was improperly charged with administrative fees.

12.     Maria Jimenez resides in Woodruff, South Carolina, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Jimenez began her employment with Charter in 2018. Ms. Jimenez worked as a Human Resources Director in the Human Resources Department, and began investing in the Plan in 2018. Ms. Jimenez' employment with Charter ended in 2023, but she remains an active participant in the Plan. As described in more detail below, Ms. Jimenez's account in the Plan was improperly charged with administrative fees.

**II.     Defendants**

13.     Charter (NYSE: CHTR) is a publicly traded telecommunications and mass media corporation organized under the laws of Delaware, with its principal place of business in Stamford, Connecticut. As of December 31, 2024, Charter had over 94,000 employees worldwide, and reported over $55 billion in annual revenue.

14.     Charter is the Plan's sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1002(16)(A). Charter also is the named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2). Charter served in these roles throughout the class period. In these capacities, Charter conducted substantial and continuous business in Saint Louis, Missouri, including through its corporate offices at 12405 Powerscourt Drive, Saint Louis, Missouri 63131.

15.     As alleged herein, Charter exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

5

16.     Defendant Carolyn Wood was a Charter employee delegated and/or appointed by Charter to act as Plan Administrator, was a party-in-interest under 29 U.S.C § 1002 (14)(A), and a fiduciary of the Plan during the Class Period under 29 U.S.C. § 1002 (21)(A).

17.     Defendant Paul Weber is a Charter employee delegated and/or appointed by Charter to act as Plan Administrator and Senior Director of Retirement Benefits, was a party-in-interest under 29 U.S.C. § 1002 (14)(A), and a fiduciary of the Plan during the Class Period under 29 U.S.C. § 1002 (21)(A).

18.     John Does 1–10 are unknown employees, agents, and/or delegates of Charter who exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the administration, management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, were fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii). Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities. They are referred to herein within the definition of "Charter."

## ERISA'S FIDUCIARY STANDARDS

19.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;

> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> [and]
>
> (D)   **in accordance with the documents and instruments governing the plan** insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III. (emphasis added)

20.     Under ERISA, fiduciaries that exercise any authority or control over plan assets or the administration of plan, must act prudently and for the *exclusive* benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

21.     Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. § 1106 because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (C) furnishing of goods, services, or facilities between the plan and party in interest; [or]
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

22.     Under 29 U.S.C. § 1106(b), fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) provides that the fiduciary

shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

23.     "Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting H.R. Rep. No. 93-1280 (1974)); *see also* 29 C.F.R. § 2550.408b-2(e)(1).

24.     The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

25.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## FACTS APPLICABLE TO ALL COUNTS

**I.     The impact of fees on defined contribution plans**

26.     "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255. In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[1] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined

---

[1] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RESEARCH INSIDER, Oct. 2012.

benefit plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. In short, defined contribution plans have become America's retirement system.

27.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

28.    Each participant in a defined contribution plan has an individual account and directs plan contributions, both from the participant and from the matching contribution of her employer, into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) (handled by undersigned counsel). Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

29.    The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points ("bps"). (One basis point is equal to $1/100^{th}$ of one percent.) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

30.    The plan's fiduciaries have control over these expenses and other expenses. For example, the fiduciaries are responsible for hiring service providers, such as recordkeepers, trustees, legal counsel, among others and negotiating and approving those service providers' fees

10

that are charged to the plan. Under ERISA, as set forth above, fiduciaries must make sure fees are reasonable.

31.    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

32.    Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants only pay those expenses that are allowed and no more than a reasonable level of those allowable fees.

## II.    The Plan

33.    The Plan is a defined contribution, individual account employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34). Accordingly, the Plan provides "for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

34.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1) restated on January 1, 2017.

---

[2] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/8KAR-W4JR.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8VCU-E7PC.

35.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan and another Charter-sponsored defined contribution plan, the Charter Communications, Inc. Retirement Accumulation Plan, are held in the Charter Communications, Inc. Defined Contribution Plans Master Trust ("Master Trust"). At all relevant times herein, the Plan comprised approximately 90% of the total assets held in the Master Trust.

36.     The Plan is one of the largest defined contribution plans in the United States. As of December 31, 2018, the Plan had 104,599 active participants, and $4,397,561,956 in total net assets. As of December 31, 2024, the Plan had 114,721 active participants, and $8,947,900,437 in total assets.

37.     Under the Plan, participants are responsible for investing in their individual accounts and will receive in retirement only the current value of that account, which will depend on wage withholdings from employees' compensation, employer matching contributions, and on the performance of investment options net of fees and expenses.

38.     Throughout the class period, the Plan has been funded by a combination of participant contributions (or wage withholdings) and Charter's employer matching contributions, each of which are deposited in the Plan's Master Trust account and allocated to individual participant accounts. The Plan provides that Charter shall provide the aggregate amount of matching contributions in cash to the trustee each payroll period as soon as practicable. Once deposited, these participant and employer contributions become Plan assets.

39.     Under the terms of the Plan, Charter made matching contributions of 100% of up to 6% of a participant's eligible compensation for each year during the class period. Plan participants' own contributions immediately vest, along with any income or losses on those

balances. Charter's matching contributions, and any income or losses on those balances, become vested after three to five years of service, based on various schedules.

40. If a participant's employment with Charter terminates prior to Charter's matching contributions fully vesting, the balance of any unvested matching contributions in the Plan participant's individual account are forfeited by the Plan participant. Although these balances are forfeited by the Plan participant, the assets in that individual's forfeited account are transferred to the Plan's forfeiture account and remain Plan assets. As with any Plan assets, Charter has a continuing duty to monitor and administer them in accordance with the Plan and ERISA.

41. On an annual average between 2019 and 2024, over 20,000 Plan participants terminated their employment with Charter with accrued benefits that were less than 100% vested. However, they remained active participants under the Plan.

42. Section 12.4 of the Plan, titled "Exclusive Benefit," which falls under Article 12 of the Plan titled "Fiduciary Provisions[,]" provides that Defendants were required to, among other things, act "solely in the interest of the Participants and their Beneficiaries and with care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

III.   **The terms of the Plan and use of Plan forfeiture assets**

43. From January 1, 2017, to December 31, 2024, Section 6.9 of the Plan mandated, without qualification, how Plan forfeiture assets would be used by Charter. Specifically, Plan forfeiture assets were *first* required to be used to "pay Plan administrative expenses." *Only* if the Plan forfeiture assets "exceed Plan administrative expenses," the remaining assets could then be used to offset Charter's (and Charter's affiliates) required employer matching contributions.

13

Assets in Accounts which are forfeited **shall be used to pay Plan administrative expenses**. To the extent that forfeitures exceed Plan administrative expenses, forfeitures shall be used to reduce the Employer Contributions[.] (emphasis added).

44.    Section 11.3 of the Plan reiterated that "all expenses of administration of the Plan . . . shall be paid out of forfeitures." That section also identified examples of the types of administrative expenses that were required to be paid by Plan forfeiture assets as follows:

> **All expenses of administration of the Plan**, including legal fees, agents' fees, costs of supplies, auditing fees, and other costs of operation shall be paid out of forfeitures, if any, and if none, borne by Charter, which shall upon request reimburse the Trustee from time to time therefor. (emphasis added).

45.    Charter, the drafter of the Plan, plainly required forfeited Plan assets to fund expenses of Plan administration to benefit the participants and beneficiaries, not to fund Charter's matching contribution obligation.

46.    In direct violation of these terms of the Plan, during the class period, Charter used Plan forfeiture assets to reduce its employer matching contributions instead of paying Plan administrative expenses. In 2019, Charter reported in its Form 5500 that it used $16.3 million in Plan forfeiture assets to reduce its employer matching contributions.[4] However, in that same required annual filing with the Department of Labor, Charter reported that *Plan participants were charged* an allocation of administrative expenses paid by the Plan in the amount of $7.3 million.

47.    The same practice was employed by Charter to reduce its employer matching contributions with Plan forfeiture assets from 2020 through 2024, as shown in the following chart based on information contained in the Plan's Forms 5500 filed with the Department of Labor.

---

[4] The amounts in this paragraph and the subsequent paragraphs are based on the best information and estimates currently available, including but not limited to, information derived from the Plan's Form 5500s, including the Master Trust's Form 5500.

14

| Year | Forfeiture Assets Used to Reduce Employer Contributions | Administrative Expenses Paid by Plan participants |
|---|---|---|
| 2020 | $29.9 million | $7.5 million |
| 2021 | $31.8 million | $8.5 million |
| 2022 | $44.4 million | $7.4 million |
| 2023 | $35.3 million | $8.2 million |
| 2024 | $48.1 million | $9.3 million |
| Total | $189.5 million | $40.9 million |

**IV.    Charter violated the terms of the Plan by using Plan forfeiture assets to reduce its required employer matching contributions rather than paying the Plan's administrative expenses.**

48.    Despite the terms of the Plan, from 2019 through 2024, Charter disloyally and imprudently benefited itself by continuously prioritizing the use of Plan forfeiture assets to reduce its required employer matching contribution obligations rather than using those Plan assets to pay for administrative expenses charged to Plan participant accounts.

49.    The administrative expenses unlawfully charged to Plan participants' accounts included fees for administrative services such as recordkeeping services, withdrawal fees, and managed account services. Simply stated, if Charter had followed the mandatory terms of the Plan, Plan participants would not have been improperly charged these administrative fees.

50.    By way of example, Plaintiff O'Donnell was charged a $29 annual administrative fee after he left Charter but remained in the Plan and a $50 in-service administrative withdrawal fee. Further, from 2019 to 2024, Plaintiff O'Donnell was charged an annual fee for managed account services ranging from $740.65 to $445.21. Based on information and belief, the managed account service fees specifically included an embedded fee for administrative services.

51.    Plaintiff Saffold incurred similar administrative expenses for his participation in the Plan. In 2024 alone, and by way of example only, he was charged $149.75 including a $7.25 quarterly administrative fee, and a $100 in-service withdrawal fee.

52.    Plaintiff Papenfuss incurred similar administrative expenses for his participation in the Plan. For instance, from 2021 through 2023, he was charged annual administrative fees and in-service withdrawal fees.

53.    Plaintiff Jimenez also incurred similar administrative expenses for her participation in the Plan. For instance, from 2022 through 2023, she was charged recordkeeping fees, in-service withdrawal fees, administrative fees, and managed account services.

54.    Plaintiff Pitts incurred similar administrative expenses for his participation in the Plan.

55.    Although Plaintiffs provide *examples* of the unlawful administrative fees charged to their accounts, the total administrative fees charged to thousands of Plan participants were substantial as indicated *supra*.

56.    In addition to these administrative fees improperly paid from Plan assets, and upon information and belief, Plan participants incurred additional administrative expenses such as Plan recordkeeping fees, trustee fees, fees for qualified domestic relations orders, legal fees, brokerage account fees, consultant fees, audit fees, mailing fees, printing fees, and other administrative fees and expenses.

57.    That the Plan incurred these additional administrative fees is evident from the Forms 5500 filed with the Department of Labor. For instance, during this period, the Plan paid millions of dollars in administrative expenses to Towers Watson for consulting services, Mercer for consulting services, Brown Smith and Wallace for auditing services, Strategic Advisors for consulting services, Fidelity Investments Institutional Operations Company, Inc. for recordkeeping services, Fidelity Management Trust Company for trustee services, and Armanino LLP for auditing services.

16

58.      In addition to these administrative expenses that should have been paid from Plan forfeiture assets, Plan participant accounts were also charged, on a pro-rata basis, additional fees attributable to administrative services provided for Plan investments. Investment managers of certain Plan investments shared a portion of the asset-based fee (or expense ratio charged to each investment option) with the Plan's primary administrative service provider (or recordkeeper) to offset the cost for administrative services (sometimes referred to as sub-transfer agency services). This practice is known as "revenue sharing."

59.      From 2017 through 2024, rather than being paid from Plan forfeiture assets, Plan participants, including Plaintiffs, paid for these administrative services through the use of revenue sharing made available by the Plan's investment managers.

60.      The pro-rata revenue sharing portion used to pay these Plan administrative expenses was substantial. It averaged over 20 basis points, which was annually charged against approximately $100 million in Plan assets. This resulted in hundreds of thousands of dollars per year of additional improperly assessed brokerage fees and administrative fees against Plan participant accounts.

61.      In violation of its duty to act for the exclusive benefit of Plan participants, Charter used Plan forfeiture assets to reduce its employer matching contribution obligations. This practice significantly harmed the Plan, its participants and beneficiaries, and resulted in an improper benefit to Charter. Charter caused Plan participants to incur further deductions from their individual accounts each year to cover administrative expenses that would have been otherwise covered in whole or in part by available Plan forfeiture assets.

62.      Contrary to the governing Plan document's clear and strict requirements on using the Plan's forfeiture assets, Charter did not inform Plan participants that forfeiture assets were

required to be exhausted *first* to pay Plan administrative expenses *before* those assets were used to reduce employer matching contributions. Rather, Charter informed Plan participants in Plan-wide communications (*e.g.*, summary plan descriptions) that "[f]orfeitures are generally used to pay Plan administrative expenses, reduce Charter's contributions to the Plan, or reinstate Participant accounts." Under the terms of the Plan, Charter did not have the discretion to use forfeiture assets to reduce its contributions before Plan administrative expenses were paid in full.

63.     Further, Defendants' decisions to use Plan forfeiture assets to reduce employer contributions instead of paying Plan expenses reduced the value of Plan assets and the accounts of Plan participants and the benefits available to Plan participants.

64.     Defendants' failure to use Plan forfeitures to reduce Plan expenses was in violation of their duty to act *solely* in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

65.     Defendants improperly, disloyally and imprudently exercised discretion over, and control of, Plan assets and consistently chose to use forfeited Plan assets to serve Charter's interest at the expense and to the detriment of the Plan and Plan participants, by allocating forfeited Plan assets toward reducing Charter's contribution obligation to the Plan.

## V.     Charter ultimately amended the Plan effective January 1, 2025

66.     Effective January 1, 2025, Charter amended Sections 6.9 and 11.3 of the Plan relating to the use of Plan forfeiture assets.

67.     Through the amendment of Section 6.9, Defendants **reversed** the prioritization as to how Plan forfeiture assets would be used. The Plan now mandates that those assets must first be used to reduce Charter's required employer matching contributions. Any remaining Plan

forfeiture assets were then to be used to pay "any expenses of administration not allocated" to a Plan participant's account.

> Forfeitures. Assets in Accounts which are forfeited and not reinstated during the Plan Year pursuant to Section 6.10 or 6.11 shall be used to reduce the Employer Contributions for the immediately following Plan Year … If forfeitures exceed Employer Contributions, any excess forfeitures shall be used to pay any expenses of administration not allocated to a Participant's Account as described in Section 11.3.

68.     In addition to this amendment and reversal of Charter's procedure governing Plan forfeiture assets, Charter amended Section 11.3 specifying that Plan recordkeeping fees, both per-capita and pro-rata (revenue sharing), along with other specifically identified administrative expenses, would only be paid by Plan participants. For other Plan administrative expenses, such as trustee and brokerage fees, Plan forfeiture assets would be used to pay them but only if such assets remain as provided in Section 6.9.

69.     Section 11.3 of the Plan provided the following:

> Expenses attributable to the acquisition of investments in a Participant's Account and a proportionate share of the Plan's recordkeeping fees, which may be assessed on either a pro rata or per capita basis, as determined by the Administrator, as well as expenses assessed in connection with certain transactions, which may include, but shall not be limited to, withdrawals, distributions, qualification of domestic relations orders, and Participant loans, shall be assessed to the applicable Participant's account. All other reasonable and necessary expenses that may arise in connection with the administration of the Plan and Trust, including Trustee and brokerage fees, and other expenses associated with fund investments, legal fees, agents' fees, costs of supplies, auditing fees, and other costs of operation, shall be paid by the Trustee from forfeitures, to the extent that any forfeitures remain as provided in Section 6.9, and if none, borne by Charter, which shall upon request reimburse the Trustee from time to time therefor.

70.     The distinctions between the Plan administrative expenses, as defined by Charter, that would and would not be subject to payment from Plan forfeiture assets *were not contained* in the Plan from January 1, 2017, through December 31, 2024. This definition confirms the broad

19

array of Plan administrative expenses that should have been paid from Plan forfeiture assets for all Plan participants from January 1, 2017, through December 31, 2024.

71.   These amendments reflect that the definition of "expenses of administration" for the Plan prior to 2025 was a broad one that encompassed the broadest array of fees, including fees that appear in the amendment that were not expressly contained in the Plan from 2017 through the end of 2024.

72.   For example, the Department of Labor suggests the following categories of fees constitute "Administrative expenses" on the Form 5500 filing, and accordingly, the Plan's 2023 Form 5500 lists the following under "Administrative Expenses":

(1) Salaries and allowances[;]

(2) Contract administrator fees[;]

(3) Recordkeeping fees[;]

(4) IQPA audit fees[;]

(5) Investment advisory and investment management fees[;]

(6) Bank or trust company trustee/custodial fees[;]

(7) Actuarial fees[;]

(8) Legal fees[;]

(9) Valuation/appraisal fees[;]

(10)  Other trustee fees and expenses[; and]

(11)  Other expenses[.]

73.   Moreover, the very fact that Charter changed the terms of the Plan to *now* allow it to prioritize the use of forfeited assets to reduce its contribution obligations over the payment of Plan administrative fees demonstrates that the Plan did not previously allow this practice.

20

74.     Based on information and belief, at end of year 2024, and before the effective date of the aforementioned change to the terms of the Plan, millions of dollars remained as unallocated Plan forfeiture assets.

## CLASS ACTION ALLEGATIONS

75.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

76.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Charter Communications, Inc. 401(k) Savings Plan from February 7, 2019, through the date of judgment, excluding the Defendants.

77.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The class includes close to 100,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan

21

breached their duty to follow the terms of the Plan document; whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the fiduciaries engaged in prohibited transactions with Plan assets; whether the fiduciaries violated ERISA's anti-inurement provision by using Plan assets for their own benefit; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty.

c.      Plaintiffs' claims are typical of the claims of the class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the class because they were participants in the Plan during the class period, have no interest that is in conflict with any other member of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

78.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

79.    Plaintiffs' counsel, Schlichter Bogard LLC ("Schlichter Bogard") and Chimicles Schwartz Kringer & Donaldson-Smith LLP ("Chimicles Schwartz") (collectively, the "Firms"), will fairly and adequately represent the interests of the class under Rule 23(g). The Firms have vast experience in the area of ERISA fiduciary breach litigation.

80.    Schlichter Bogard has been appointed class counsel in over 40 ERISA fiduciary breach actions. Dating back to 2006, Schlichter Bogard has a proven track record of vigorously pursuing the rights of ERISA plan participants. It was the first firm to try an ERISA excessive fee case and successfully obtain a judgment on behalf of plan participants. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012). After multiple appeals to the Eighth Circuit and remands to the district court, and over 25,000 hours of attorney and paralegal time, the parties ultimately settled the action in 2019, almost 14 years after filing. *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880, at *4 (W.D. Mo. Aug. 16, 2019). *Tibble v. Edison International* is another example of Schlichter Bogard's unwavering efforts to protect the rights of ERISA plan participants. In particular, Schlichter Bogard appealed unfavorable rulings

after a partial trial to the Ninth Circuit, lost there, and ultimately obtained a successful unanimous decision at the United States Supreme Court, reversing the Ninth Circuit. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).

81.    Indeed, Schlichter Bogard's efforts have "led to enormous fee savings for plan participants." *Cates v. Trs. of Columbia Univ.*, No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (noting that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees") (citation omitted). With these efforts, Schlichter Bogard is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012). Schlichter Bogard's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

24

82.     Chimicles Schwartz also has extensive ERISA experience. Chimicles Schwartz' track record in ERISA fiduciary breach litigation includes successfully representing famous performers in *Edward Asner v. SAG-AFTRA Health Fund*, No. 20-10914 (C.D. Cal.) and prominent musicians in *Snitzer v. Board of Trustees of the American Federation of Musicians and Employers' Pension Fund*, No. 17-cv-5361 (S.D.N.Y.); winning reversals of dismissals and thereafter securing settlement with respect to 403(b)/401(k) breach of fiduciary duty claims in *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172 (3d Cir. 2024) (argued by Mr. Schwartz) and *Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020) (where Mr. Schwartz served as plaintiffs' co-lead counsel); prosecuting and  negotiating an $8.25 million settlement of Section 1104(a)(1)(D) claims which provided class members near-full net recovery of the improper administrative fees in *In re Cigna-American Specialty Health Administrative Fee Litigation*, No. 16-03967 (E.D. Pa); and working on the team representing Firestone in cases that resulted in the decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). More generally, Mr. Schwartz and Mr. Kriner have a decades-long track record of securing large, meaningful recoveries, including full-recovery settlements and judgments for the classes they have represented. *See, e.g.*, *In re: Phillips Recalled CPAP Recalled Prods. Litig.*, MDL No. 3014 (W.D. Pa.) ($1.7 billion recovery); *In re Macbook Keyboard Litig.*, No. 18-2813 (N.D. Cal.) ($50 million settlement); *Rodman v. Safeway Inc.*, No. 11-3003 (N.D. Cal.) ($42 million full-recovery judgment affirmed on appeal); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 902 (C.D. Cal. 2016); *In re Apple iPhone/iPod Warranty Litig.*, No. 10-1610 (N.D. Cal.) ($53 million settlement); *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, No. 06-7023, 2016 U.S. Dist. LEXIS 25290, at \*35 (N.D. Ill. Feb. 29, 2016); *Wong v. T-Mobile*, No. 05-73922 (E.D. Mich) (full-

recovery settlement); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, No. 07-1817 (E.D. Pa.) (settlement valued at between $687-$815 million).

**CAUSES OF ACTION AGAINST ALL DEFENDANTS**

**Count I: Failure to Follow the Terms of the Plan**
**(29 U.S.C. § 1104(a)(1)(D))**

83. Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

84. Defendants are required to discharge their fiduciary duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D).

85. When exercising control over forfeited Plan assets and using them to reduce Charter's employer matching contributions, Defendants failed to discharge their duties in accordance with the Plan in violation of ERISA. The Plan required forfeited Plan assets to *first* be used to pay administrative expenses, which was not done. As a result of Defendants' conduct, Charter economically benefited itself by saving millions of dollars each year in employer matching contributions at the expense of Plan participants and beneficiaries.

86. Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

87. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breach of their duty to follow the terms of the Plan alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

88.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## Count II: Breach of Fiduciary Duty of Loyalty
## (29 U.S.C. § 1104(a)(1)(A))

89.     Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

90.     Defendants are required to manage the assets of the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" 29 U.S.C. § 1104(a)(1)(A)(i)–(ii).

91.     Throughout the class period, Defendants breached their duty of loyalty by using Plan forfeiture assets, to the benefit of Charter, rather than solely in the interest of Plan participants and beneficiaries. Instead of using forfeited Plan assets to reduce or eliminate the administrative expenses charged to Plan participants, Defendants chose to reduce Charter's employer matching contributions. This benefited Charter by saving it millions of dollars each year at the expense of the Plan and its participants by greatly decreasing Charter's employer matching contributions.

92.     Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

27

93.     Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

94.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### Count III: Breach of Fiduciary Duty of Prudence
### (29 U.S.C. § 1104(a)(1)(B))

95.     Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

96.     Defendants are required to manage the assets of the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

97.     Throughout the class period, Defendants breached their duty of prudence by failing to use forfeited Plan assets to pay Plan administrative expenses and instead used such assets to benefit Charter by reducing its employer matching contributions to the Plan. In deciding to allocate forfeitures for the benefit of Charter, Defendants used an imprudent and flawed decision-making process to determine what was in the best interest of Plan participants, despite Defendants' clear conflict of interest when making this decision that favored Charter's corporate interests.

98.     Defendants caused losses to the Plan by forcing Plan participants and beneficiaries to incur avoidable administrative expenses. These losses resulted in less money invested and lost investment returns on those retirement assets.

99.     Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

100.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### Count IV: Breach of ERISA's Anti-Inurement Provision
### (29 U.S.C. § 1103(c)(1))

101.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

102.    Under 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

103.    Defendants failed to use forfeited Plan assets to benefit Plan participants by reducing or eliminating Plan administrative expenses. Instead, Defendants chose to benefit Charter by reducing Charter's matching contribution obligations. By decreasing Charter's matching

29

contributions, Charter saved millions of dollars each year at the expense of the Plan. As a result, Defendants caused the assets of the Plan to inure to the benefit of Charter.

104.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

## Count V: Prohibited Transactions
### (29 U.S.C. § 1106(a)(1))

105.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

106.    Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. § 1106(a). Under 29 U.S.C. § 1106(a)(1), "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect — (A) exchange . . . of any property between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"

107.    Charter is a party in interest because it is a Plan fiduciary, Plan administrator, and the employer of employees covered by the Plan. 29 U.S.C. § 1002(14)(A), (C).

108.    Defendants caused the Plan to use forfeited Plan assets to pay employer matching contributions. In particular, and on no less than a quarterly basis, Defendants affirmatively directed the Plan's trustee and/or recordkeeper to use forfeited Plan assets to offset or reduce Charter's contribution obligations rather than following the Plan requirements.

109.    Defendants therefore caused the Plan to engage in transactions they knew or should have known constituted an exchange of property (Plan assets) to Charter to pay employer matching

30

contributions in violation of 29 U.S.C. § 1106(a)(1)(A); and engage in transactions they knew or should have known constituted the use of Plan assets for the benefit of Charter through reduced employer matching contributions in violation of 29 U.S.C. § 1106(a)(1)(D). This prohibited conduct saved Charter millions of dollars annually in employer matching contributions.

110.    Defendants caused the Plan to suffer losses in the amount of the Plan assets that were used to pay employer matching contributions and the lost investment returns on those assets because of these prohibited transactions.

111.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count which encompasses the Plan's payment of avoidable administrative expenses incurred by participants. Each Defendant is also subject to other equitable or remedial relief as appropriate.

**Count VI: Prohibited Transactions**
**(29 U.S.C. § 1106(b)(1−3))**

112.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

113.    Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. § 1106(b). Under 29 U.S.C. § 1106(b), "[a] fiduciary with respect to a plan shall not — (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

114.    Defendants were Plan fiduciaries and caused the Plan to use forfeited Plan assets to pay employer matching contributions. They therefore dealt with the assets of the Plan in their own interest or for Charter's own account in violation of 29 U.S.C. § 1106(b)(1); acted in a transaction involving the Plan on behalf of a party (Charter) whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. § 1106(b)(2); and received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan in violation of 29 U.S.C. § 1106(b)(3). This prohibited conduct saved Charter millions of dollars annually in employer matching contributions.

115.    Defendants caused the Plan to suffer losses in the amount of the Plan assets that were used to pay employer matching contributions and the lost investment returns on those assets because of these prohibited transactions.

116.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count which encompasses the Plan's payment of avoidable administrative expenses incurred by participants. Each Defendant is also subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

117.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached the duty to follow the terms of the Plan documents, breached their fiduciary duties, violated the anti-inurement provision, and engaged in prohibited conduct and transactions as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each ERISA violation described above, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

- determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

- enjoin the fiduciaries who have breached their fiduciary duties from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint the Plaintiffs as class representatives, and appoint Schlichter Bogard LLC and Chimicles Schwartz Kringer & Donaldson-Smith LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

33

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.


December 16, 2025                                    Respectfully submitted,

                                                    SCHLICHTER BOGARD LLC

                                                    By: /s/ Troy A. Doles
                                                    Jerome J. Schlichter #32225 (MO)
                                                    Troy A. Doles #47958 (MO)
                                                    Kurt C. Struckhoff #61873 (MO)
                                                    Kaitlin Minkler #73867 (MO)
                                                    100 South Fourth Street, Suite 1200
                                                    St. Louis, Missouri 63102
                                                    Telephone: +1 (314) 621-6115
                                                    Facsimile: +1 (314) 621-5934
                                                    jschlichter@uselaws.com
                                                    tdoles@uselaws.com
                                                    kstruckhoff@uselaws.com
                                                    kminkler@uselaws.com

                                                    CHIMICLES SCHWARTZ KRINER
                                                    & DONALDSON-SMITH LLP

                                                    By: /s/ Steven A. Schwartz
                                                    Steven A. Schwartz
                                                    361 Lancaster Avenue
                                                    Haverford, PA 19041
                                                    Telephone: (610) 645-4720
                                                    steve@chimicles.com
                                                    *pro hac vice*

                                                    By: /s/ Robert J. Kriner, Jr.
                                                    2711 Centerville Road - Suite 201
                                                    Wilmington, DE 19808
                                                    Telephone: 302-656-2500
                                                    rjk@chimicles.com
                                                    *pro hac vice*

                                                    *Attorneys for Plaintiffs & the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 16, 2025, a copy of the foregoing was filed electronically using the Court's CM/ECF system.

By: /s/ Troy A. Doles

Troy A. Doles